SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GREGORY K. WILLIAMS**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  11-cv-1275 (RLW) |
| | ) | |
| | ) | |
| **PERKINS + WILL, INC.**, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION[1]**

At the time he initiated this lawsuit, Plaintiff Gregory K. Williams was 63 years old.  In

this action Williams asserts age discrimination claims pursuant to 29 U.S.C. § 621, *et seq*. and

---

[1]  This unpublished memorandum opinion is intended solely to inform the parties and any
reviewing court of the basis for the instant ruling, or alternatively, to assist in any potential future
analysis of the *res judicata*, law of the case, or preclusive effect of the ruling.  The Court has
designated this opinion as "not intended for publication," but this Court cannot prevent or
prohibit the publication of this opinion in the various and sundry electronic and legal databases
(as it is a public document), and this Court cannot prevent or prohibit the citation of this opinion
by counsel.  *Cf*. Fed. R. App. P. 32.1.  Nonetheless, as stated in the operational handbook
adopted by our Court of Appeals, "counsel are reminded that the Court's decision to issue an
unpublished disposition means that the Court sees no precedential value in that disposition."
D.C. Circuit Handbook of Practice and Internal Procedures 43 (2011).

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01, *et seq*., against

his former employer, Perkins + Will, Inc. [2]

Presently before the Court is P+W's Motion for Summary Judgment.  (Doc. 15.)  For the

reasons set forth below, the Court will grant P+W's motion.

## I.      BACKGROUND FACTS

Although not explicitly stated in the pleadings, it appears that Perkins + Will (P+W) is an

architectural firm that also provides interior design, environmental and related services.

Williams was an at-will employee, who began working for P+W in its New York City office as

the Corporate+Commercial+Civic ("CCC") Market Sector Leader ("MSL") in August 2007.

(Doc. 15, Defs.' SOF ¶¶ 1, 3).  As the CCC MSL, Williams was responsible for a variety of

activities, including business development, negotiating contracts, and building business alliances.

(*Id*. ¶¶ 1-3.)  This work spanned all areas of the practice, including architecture, interiors,

strategic planning, and any other service offerings that fit within the CCC client sector.  (*Id*. ¶¶ 1-

3.)

In early 2009, Steve Manlove ("Manlove"), the Managing Director of P+W's Washington,

D.C. office, became interested in hiring someone to fill the CCC MSL role in the D.C. office

and, around this same time, P+W became interested in broadening its Federal Practice.  Manlove

contacted P+W's Chief Marketing officer ("CMO"), William Viehman ("Viehman"), and both

men spoke with P+W's Chief Executive Officer, Phil Harrison ("Harrison"), about the matter.

---

[2]   Also named in the complaint are related entities, Perkins + Will Federal Design Group, Inc.
and Perkins + Will (Virginia), Inc.  The Court will refer to the defendants collectively as P+W.

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

Ultimately, on February 13, 2009, they offered Williams a dual position in the D.C. office as the

CCC MSL and the Federal Practice Director, the latter being a newly created position.  (*Id*. ¶¶ 4-

9.)

The purpose of the Federal Practice was to assist P+W with obtaining contracts to perform

architectural services for the federal government.  (Defs.' SOF ¶ 31.)  As Federal Practice

Director, Williams' role was to identify prospective projects, increase knowledge across the firm

about the Federal Practice, partner with the global market sector leaders (GMSL), as well as

facilitate and support the work of others in generating federal business.  (Defs.' SOF ¶11.)

Williams admits that he was responsible for doing anything that he could to further the

goal of the Federal Practice.  (Williams Dep. at 64.)  However, he testified that he does not know

whether any of his efforts led to procurement of any federal work for P+W, (Williams Dep. at

107-9), and in his summary judgment response he points to nothing in the record that might

suggest his efforts did in fact lead to any federal contracts.

Because Williams was not in a sales position, but instead held a marketing position, he

reported directly to CMO Viehman.  (Defs.' SOF ¶ 10.)  In early September of 2009,

approximately eight months after Williams became Federal Practice Director, Viehman sent an

email to various P+W groups addressing the goal of the Federal Practice to secure contracts as a

result of a recent $3.5 billion stimulus bill.  In that email, which Williams admittedly received,

Viehman indicated that "the next 12 months [were] critical for the firm to market to the Federal

Government."  (Defs.' SOF ¶¶ 13, 15.)

Because Williams' duties included supporting others in generating federal business, part

of his job involved providing  P+W with potential federal prospects and information about

federal practice.  (*See* Williams Dep. at 64, 66-67.)  During his tenure, Williams worked

primarily with three GMSLs: Manuel Cadrecha (Corporate+Commercial+Civil) Dan Watch

(Science and Technology) and Jean Mah (Health Care).  (*Id*. at 66.)  According to Viehman, all

three gave him negative feedback about the Federal Practice: they felt they were not getting the

support they needed from the practice.  (Viehman Dep. at 35-37.)   Mah described the

information she obtained from the practice as "stale, not fresh," and she complained she did not

get help with a VA Hospital prospect.  (*Id*. at 36.)  Cadrecha did not find the reports from the

Federal Practice very useful.  (*Id*. at 37.)  Watch found that the reports on potential prospects

where not the ones of interest to the Science and Technology group.  (*Id*. at 36-37.)  There is

nothing in the record that indicates precisely what Viehman told Williams about the comments

from the GMSLs; but it is undisputed that a meeting was held in Miami during January 2010 for

the purpose of allowing the GMSLs to talk with Williams about what information and help they

needed from him.  (Defs.' SOF ¶¶ 19-20.) [3]

Eventually Williams was approached about reducing his emphasis on his CCC role and

increasing his emphasis on the Federal Practice because the latter was taking a great deal of his

time.  (Defs.' SOF ¶ 26; Williams Dep. at 81.)  Sometime during the first quarter of 2010, P+W

hired George Hellmuth as a managing principal.  Hellmuth also took over the CCC role and

---

[3]  Williams argues that this evidence regarding what the GMSLs purportedly told Viehman is
inadmissible hearsay.  As P+W correctly points out, however, these comments are admissible
because they are not offered for the truth of the matter asserted, but rather to show the effect on
the listener. *See Ransom v. Ctr. for Nonprofit Advancement*, 514 F. Supp. 2d 18, 27 n. 7 (D.D.C,
2007) (citing Fed. R. Evid. 801(c)).

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

Williams began devoting all of his time to the Federal Practice.  (Defs.' SOF ¶ 28; Williams Dep. at 81; Manlove Dep. at 82.) [4]

On June 9, 2010 Viehman sent an email to Williams because Viehman had not "had an up-date from [Williams] in a while" and felt "out of touch."  (Defs.' SOF ¶ 24.)  Although it is not clear how much time had passed between the prior update and the email, Viehman asked for a report on Williams' progress since the prior update.  (Williams Dep. at Ex. 14.)  In the same email Viehman indicated that he wanted to "share some feedback" from the marketing managers:

> There still appears to be some confusion regarding [sic] role and responsibility of you and your group and what the individual sectors/offices should be doing.  More than one Marketing Manager reported that they didn't feel like they got clear advice from the Federal Services group regarding pursuit strategy, intel, decision makers, processes, etc.  I don't know whether they didn't ask the right questions or whether you all didn't have the answers when asked and didn't offer means to find out.  We need to understand the interaction to-date between you and your group and the firm wide marketers, and determine effectiveness and a strategy moving forward.
>
> Let's talk.  I want to be fully informed by the 16th . . . .

(Williams Dep. at Ex. 14.)

Williams' reaction was that "we ha[d] a problem. We need[ed] to do something about this."  (Williams Dep. at 99-100.)  In his opinion, it appeared that a prior memorandum Viehman had distributed about which functions the Federal Practice served had not "sunk in" because "some people wanted things we couldn't give them.  For example, we c[ould not] give them pursuit strategies.  That comes from their market sector leader.  So - - pursuit strategy has

---

[4]  Manlove testified that he believed Hellmuth was in his late 60s.  (Manlove Dep. at 83.) Plaintiff objects, but does not provide any evidence to contradict Viehman's assessment of Hellmuth's age.

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

everything to do with how you sell the job, and we [were] not to do the selling." (*Id*. at 100.)

From Williams' perspective, the situation was "not good," because the Federal Practice did not

want "confusion about what [they] c[ould] do [and] what [they] c[ould not] do for [the GMSLs],

how the process works." (Williams Dep. at 100.) Consequently, Williams testified that after he

received the email he had been determined to address and fix the situation. (*Id*. at 101.)

Three months later, in September 2010, P+W terminated Williams. According to

Manlove, he and Viehman had been engaged in ongoing discussions even before the Miami

meeting about the lack of "traction" in the federal market and they surmised that the problem

might be related to Williams' leadership. (Manlove Dep. at 69-70; *see* Viehman Dep. at 60.)

Harrison, as CEO, was also involved in some of these discussions. (Manlove Dep. at 70.)

Manlove remembers that some of the discussions centered on concerns that both the Federal

Practice and Williams had not lived up to expectations. (Manlove Dep. at 70.)

By August 2010, as P+W was preparing to develop its 2011 business plan, Viehman first

considered terminating Williams. (Viehman Dep. at 56-57.) Viehman discussed the matter with

Harrison; the substance of that discussion involved the perception that there was a "general sense

of lack of progress, lack of success, that the strategy, as in place, was not meeting our

expectations and [P+W's] needs. . . . And [Viehman's] general feeling was [that P+W] needed a

different approach with different leadership." (*Id*. at 56-57.) Harrison approved Viehman's

decision to terminate Williams. (Harrison Dep. at 58.)

With respect to his reasons for approving the termination, Harrison testified that

> [w]e felt that the overall effort, the Federal Design Group – I mean, the
> Federal Practice group, had not made any notable progress. And as we were

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

preparing our budgets for the following year, we chose to stop funding that effort, that it – it was not yielding any positive results for the firm, and that it wasn't worth the investment we were making.

(Harrison Dep. at 58-59.)[5]

When asked during his deposition whether he thought the Federal Practice has been a failure, Viehman said he believed it had not been a success.  (Viehman Dep. at 72.)  Viehman believed that the Federal Practice had not put its resources towards the most important activities, such as going out and talking to Federal prospective clients, as well as obtaining more relevant information.  Additionally, Viehman did not think that the reports that he received, such as one that spoke of what had been done in the previous 90 days, were representative of 90 days' worth of work.  (Viehman Dep. at 72.)

At the time of Williams' termination, Viehman was 65 years old, Harrison was 45 years old and Manlove's age is unclear.  (Defs.' SOF ¶ 59.)

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Moore v. Hartman,* 571 F.3d 62, 66 (D.C. Cir. 2009).  To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, Fed. R. Civ. P. 56(c)(1)—that the quantum of evidence "is such that a reasonable jury could return a

---

[5]  According to P+W, Williams admitted that Harrison felt this way about Williams' performance.  This statement is incorrect.  Williams does not dispute that Harrison testified to such, but Williams continues to dispute that P+W was, in fact, dissatisfied with his performance.

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

verdict for the nonmoving party." *Steele v. Schafer,* 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting

*Anderson,* 477 U.S. at 248).  While the Court views all facts in the light most favorable to the

nonmoving party in reaching that determination, *Keyes v. District of Columbia,* 372 F.3d 434,

436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of

evidence" in support of its position, *Anderson,* 477 U.S. at 252.  But "[i]f material facts are at

issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not

available." *Kuo–Yun Tao v. Freeh,* 27 F.3d 635, 638 (D.C. Cir. 1994).

### III.   ANALYSIS

P+W argues that it is entitled to summary judgment for two reasons.  First P+W argues that

Williams is unable to establish a prima facie case of discrimination under the *McDonnell*

*Douglas* paradigm because he cannot show that he met P+W's performance expectations and he

cannot show that he was replaced by someone outside the protected class.  *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Second, P+W argues that that it had a legitimate

non-discriminatory reason for terminating Williams: he did not met P+W's performance

expectations.

In this Circuit, once an employer comes forward with a legitimate non-discriminatory reason

for its decision, "the district court need not— and should not—decide whether the plaintiff

actually made out a prima facie case." *Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494

(D.C. Cir. 2008) (emphasis in original).  In such cases, the burden-shifting framework falls to the

wayside, and the "sole remaining question" for the Court to resolve is "whether, based on all the

evidence, a reasonable jury could conclude that the [employer's] proffered reason for the

[challenged decision] was pretext for [discrimination]." *Pardo–Kronemann v. Donovan,* 601

F.3d 599, 604 (D.C. Cir. 2010).  In so determining, the Court must consider: "(1) the plaintiff's

prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered

explanations for its actions; and (3) any further evidence of discrimination that may be available

to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the

part of the employer) or any contrary evidence that may be available to the employer . . . . "

*Czekalski v. Peters,* 475 F.3d 360, 363–64 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.,*

156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). "This boils down to two inquiries: could a

reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the

jury infer that this pretext shielded discriminatory motives?" *Murray v. Gilmore,* 406 F.3d 708,

713 (D.C. Cir. 2005). [6]

Thus, rather than examine whether Williams has made out a prima facie case for

discrimination, the Court will focus on whether Williams has provided evidence from which a

reasonable fact finder might determine that his age was the true reason for this termination.  As

evidence of pretext, Williams points to the following: (1) P+W's purportedly changed reasons

for the termination; (2) his positive performance evaluation in New York;  (3) the lack of further

performance evaluations and the lack of counseling or warning that his job performance was

unsatisfactory; (4) the purported absence of evidence that the Federal Practice was responsible

---

[6]   The *McDonnell Douglas* framework also applies to cases alleging discrimination under the
DCHRA.  *See Howard Univ. v. Green*, 652 A.2d 41, 45 & n.3 (D.C. 1994);  *Metrocare v.
Washington Metro. Area Transit Auth.*, 679 F.2d 922, 925 (D.C. Cir. 1982).

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

for achieving sales and developing pursuit strategies; and (5) the purported evidence of age bias

with respect to another older employee. [7]

A.      Purportedly Changed Reasons for Williams' Termination

As evidence of pretext Williams points to P+W's purported abandonment of a previously

asserted reason for his termination.  According to Williams, P+W has maintained "throughout"

this litigation that it terminated him because his job performance was substandard both in the

New York Office, as well as in the D.C. Office.  (*See* Doc. 18, Pl.'s Resp. at p. 1 n.1.)  In support

of this argument, Williams cites to a court filing in this case by P+W in which it discusses

alleged oral counseling provided to Williams regarding his job performance in New York.  (*See*

Doc. 18, Pl.'s Resp. at p. 1 n.1) (citing Doc. 7, Defs.' Dispositive Motion Letter).  Although

Williams does not cite to any legal authority in his brief, presumably he relies on the "shifting-

reasons" theory to establish evidence of pretext.  *See Geleta v. Gray*, 645 F.3d 408, 413-14 (D.C.

Cir. 2011) ("[S]hifting and inconsistent justifications are 'probative of pretext.'") (citations

omitted); *Domínguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a

---

[7] Although it is undisputed that no one held the title of Federal Practice Director after Williams' departure, (s*ee* Defs.' SOF ¶ 45), Williams contends that his job functions were taken over by others. (Doc. 18-1, Pl.'s SOF Resp. ¶ 45.)  In support of this contention he cites to the depositions of Harrison and Viehman, both of whom simply testified that Jenna Coltrain (whom Williams claims is younger than he) worked part-time to continue gathering and publishing information, as well as to maintain a database and communicate with those involved in marketing. (Harrison Dep. at 59-60;  Viehman Dep. at 71-72.)  The record reveals that such functions did not encompass all or even the most important duties associated with the Federal Practice Director Position. (*See* Doc. 21-1, Pappademetriou Dep. at Ex. 1, Pappademetriou Aff. ¶ 4; Williams Dep. at 64-66) (discussing Williams' travel, attendance at conferences, business meetings and introductions made between federal agencies and P+W).  Thus, Coltrain's duties after Williams' departure do not establish evidence of pretext.

company, at different times, gives different and arguably inconsistent explanations, a jury may

infer that the articulated reasons are pretextual.").

In response, P+W correctly points out that it has not taken inconsistent positions with

respect to the reasons for Williams' termination.  In its interrogatory responses, P+W explained

that it terminated Williams because of his performance as the Federal Practice Director.  (*See*

Doc. 19, Defs.' Supplemental Appendix at Ex. 10, Interrogatory #8.)  Later, on the first page of

an unverified court filing defense counsel does discuss Williams' performance in New York, but

then connects his performance with his transfer to D.C.  (*See* Doc. 7.)  On page two of the court

filing, consistent with its interrogatory responses, P+W explicitly states that Williams was

terminated over his performance as head of the Federal Practice.  (*See* Doc. 7.)  Thus, there is no

evidence that P+W has now abandoned a previously asserted legitimate non-discriminatory

reason for his termination.

B.      Williams' New York Performance Evaluation

Next, as evidence of pretext, Williams asserts that P+W's proffered reason for his

termination is inconsistent with his performance evaluation.  In support of this argument he

points to a positive evaluation he received while in the New York office.  In that evaluation he

was rated on or above target in all areas; indeed, with respect to "profitability" he was rated

between "Performance is typically above target" and "Above Target: Performance is above and

beyond what is expected, on an ongoing basis."  (Doc. 18, Pl.'s Ex. 3, ECF pp. 4, 6-7.)

Williams' reliance on his performance evaluation in New York is unavailing.  As P+W

notes, the performance review was undertaken only six months after he began working for P+W.

Indeed, the record reveals that the reviewer qualified the evaluation by indicating that "things are

still a little early to determine results from marking efforts."  (*Id*. at ECF p. 7.)  More

importantly, the evaluation was undertaken in a different city, under a different manager and

involved a different job than Williams held at the time of his discharge.  (*See* Doc. 18-3, Pl.'s Ex.

3); *Walls v. Lahood*, Civil Action No. 06–1259 TFH/DAR, 2009 WL 872475, at *6 (D.D.C.

March 30, 2009) (noting that one supervisor's comments about plans to give plaintiff a

promotion "would not constitute evidence of pretext with respect to the reasons offered for non-

promotion by different supervisors in another organizational unit."): *Maye v. Gonzales*, No.

Civ.A. 00-0271(JDB), 2005 WL 3544292, at * 8 (D.D.C. Dec. 27, 2005) ("Nor does it suffice [as

evidence of pretext] that a single supervisor thought that plaintiff deserved a promotion, or that

plaintiff received outstanding performance evaluations in previous years.")  Thus, Williams'

prior performance evaluation does not provide evidence that P+W's legitimate non-

discriminatory reason for his termination was pretextual.


C.      The Lack of Additional Performance Evaluations and the Lack of Counseling or Warning
        Concerning Job Performance

Next Williams relies on the following as evidence of pretext: the lack of additional

performance evaluations and the lack of warning or counseling regarding his job performance.[8]

---

[8]  Despite P+W's arguments to the contrary, the Court is not convinced that a reasonable fact
finder would necessarily determine that the emails or Miami meeting were sufficient to put

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

Here too Williams' "evidence" fails.  Even if additional performance evaluations or warnings

regarding poor job performance might have been desirable, in this case the employer's failure to

provide such feedback is not sufficient to establish pretext.  *See Scheitlin v. Freescale*

*Semiconductor, Inc.*, No. CV–08–02342–PHX–FJM, 2010 WL 2232200, at \*6 (D. Ariz June 3,

2010) (explaining that the employer might have utilized alternative or better practices, but an

employer's failure to do so did not constitute pretext evidence because the anti-discrimination

laws do "not mandate best practices" ).  Williams does not have any evidence that P+W regularly

gave performance evaluations to executives in the D.C. office or regularly provided warnings to

executives prior to termination.  *See  Perry v. Shinseki,* 783 F. Supp. 2d 125, 138–39 (D.D.C.

2011)  (It "'may' be probative of the employer's 'true motivation' if (1) the [challenged conduct]

is suspicious, in and of itself,  [or] (2) the [employer] 'inexplicably departed' from its normal

procedures . . . .") (citations omitted).  Nor does Williams point to any persons outside of his

protected class whom P+W treated more favorably in this regard.  *See Brady v. Office of*

*Sergeant of Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (To show pretext, a plaintiff may offer

evidence that similarly situated employees outside the protected class were treated "more

favorably in the same factual circumstances.").  Thus, the absence of job performance feedback

after his relocation to D.C. does not establish evidence of disparate treatment or pretext. [9]

---

Williams on notice that he was in jeopardy of termination.  But, as discussed below, even
viewing the facts in the light most favorable to Williams, the Court finds that he has not
presented any evidence of pretext.

[9]  Similarly unavailing is Williams' argument that he has established evidence of pretext because
P+W has no emails documenting any concerns about his job performance.  Williams points out
that P+W officials testified that they routinely communicated by email during his tenure, but not

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

D.      The Federal Practice's Support vs. Sales Function

Next, as evidence of pretext Williams claims there is nothing in the record to establish

that the Federal Practice was responsible for "achieving sales" and developing "pursuit

strategies." (Doc. 18-1, Pl.'s Resp. at 2; Pl.'s SOF ¶ 4; Defs. SOF ¶ 10.) He explains that the

Federal Practice played a "support" or "collaborative" function: "[p]ursuit strategies were solely

the responsibility of P+W's market sector leaders or other principals in charge." (Doc. 18-1, Pl.'s

Resp. at 2; Pl.'s SOF ¶ 4; Defs. SOF ¶ 10.) Williams also notes that a document prepared by

both he and Viehman describing the role and function of the Federal Practice does not contain

any language regarding "pursuit strategies." (Pl.'s Resp. to SOF ¶ 14; Williams Dep. at Ex. 9.)

In other words, Williams wants the Court to believe that he, as head of the Federal Practice,

should not have been held responsible for P+W's failure to obtain federal contracts.

This, the Court cannot do. First, the document Williams admittedly prepared in

conjunction with Viehman explains that the Federal Practice was "actively prospecting

opportunities" and "aligning those w/GSMLs," as well as "pursuing multiple . . . contracts,

primarily CCC, which will require firmwide delivery . . . ." (Williams Dep. at Ex. 9, ECF p 24.)

While it may not have explicitly said as much, the logical implication of this language and the

logical implication of Williams' testimony is that the goal of the Federal Practice was to engage

in work that, through collaboration, would lead to federal contracts. Yet there is no evidence that

_____

one of the 10,000 plus internal e-mails produced during discovery contained any discussions
about his performance. But P+W is not required to have documentary evidence and its absence
here does not suggest pretext because there is nothing to indicate that it was unusual for P+W
principals to refrain from communicating about such matters via email.

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

P+W ever secured any such contracts as a result of those collaborative efforts.  If the blame for this failure must be placed somewhere it was a reasonable business decision for Viehman and Harrison to place it on Williams.

Whether or not they should have done so is not the question.  The question is whether their decision was tainted by discriminatory motive and Plaintiff has not presented any evidence that it was.  There is nothing unusual or suspect about holding the director of a business unit responsible for that unit's success, particularly here where it could be that the unit did not provide the information P+W thought was most useful or the unit did not provide what P+W perceived as the most viable leads.  If the purpose of a business unit is to work in collaboration with others and the company is of the opinion that the unit did not do its part to make the collaboration successful, it is logical that the company would terminate the leader of that unit. The unit leader's disagreement about whether he should bear the brunt of what might be described as a combined or group failure is of no moment where, as here, there is no evidence of discriminatory motive and there is testimony that Harrison believed that the Federal Practice "wasn't worth the investment [P+W] was making."  (Harrison Dep. 58-89.)  The federal age discrimination act "it bears repeating, does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions.'"  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation omitted).

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

E.      P+W's Allegedly Aged Biased Work Environment

Finally, Williams alleges that P+W failed to provide a work environment that was free

from age discrimination.  In support of this allegation Williams claims he witnessed age bias that

was directed at Alexander Pappademetriou, a former Director of Nationwide Project

Management for GSA whom Williams brought to P+W.  Pappademetriou was approximately 80

years old at the time he became an independent contractor at P+W.  (Doc. 21-1, Pappademetriou

Dep. at Ex. 1, Pappademetriou Aff. ¶¶ 1- 3.)  He testified that his role was to "develop

relationships between responsible officers of the federal government and Perkins + Will with the

goal of raising the exposure of Perkins + Will's architectural services in the federal

marketplace."  (Pappademetriou Aff ¶¶ 3-4; Defs.' SOF ¶ 60.)

Pappademetriou was terminated shortly after Williams and Pappademetriou admits he

was dissatisfied with his treatment by P+W.  Specifically, he testified that P+W did not seek his

"advice and guidance"; "did not respect or take into consideration [his] experience"; did not ask

him to participate in the preparation of promotional materials or proposals; refused to provide

him with business cards until Williams intervened; failed to provide him with a dedicated

telephone or office; and routinely told him to relocate his belongings to another work space.

(Pappademetriou Aff. ¶ 5.)

Despite feeling "shut-out" at P+W, when asked if he ever had a feeling or belief that his

age was the reason P+W failed to seek out his advice or guidance he responded:

A.      I don't know.  Probably, maybe, maybe.

Q.      Do you have any reason to believe that?

A.      I don't have any reason, no.

Q.      Okay.

A.      But might.

                        . . . .

Q.      And similar to my question a moment ago, do you have any reason to believe that the reason you were not invited [to meetings] was because of your age?

A.      I don't know.  You should ask them.

                        . . . .

Q.      . . . Now, in some court papers it has been represented that you might testify that Perkins + Will permitted and nurtured an environment in the workplace that was contemptuous and hostile to older workers.  Do you believe that, sir?

A.      I don't know.

(Pappademetriou Dep. at 30, 32-33.)  When asked if he had ever voiced any complaints while at

P+W that he was discriminated against because of his age, he responded "no,"  "[discrimination],

but I don't think it was for my age. . . . . They didn't use me, yeah."  (Pappademetriou Dep. at

33) (emphasis added).

        In contrast to Pappademetriou's neutral perception about potential age bias, Williams

believes P+W tolerated and nurtured age discrimination as evidenced by the following:

- "Several P+W principals mentioned to [Williams] that they preferred not to have Pappademetriou's  assistance in presentations to the government.  In one instance, after Pappademetriou made an introduction to the FAA for a project opportunity in Seattle, P+W's Seattle managing director called [Williams] and said "don't send him back" due to his age and style.  Pappademetriou was also rebuffed by P+W's Chicago office for any follow-up discussions concerning a GSA project in Kansas City."

- Williams faced "general resistance" from Viehman and a marketing director in the D.C. office about the use of  Pappademetriou's services and Williams had a difficult time

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

convincing P+W to allow Pappademetriou to attend business meetings on behalf of the
Federal Practice.

- Pappademetriou was also rebuffed by Fawell and Dan Moore concerning a project in
Virginia, even though he was responsible for the introduction.  Routinely it fell upon
[Williams] to buffer Pappademetriou from hurtful and negative comments about his
age and behavior from P+W's D.C. employees, including Manlove, Fawell and
Moore.

(Doc. 18-3, Williams Decl. ¶¶ 2-4.)

This evidence does not support an inference of discrimination with respect to Williams'

termination.   First, there is no evidence that the unnamed principals rejected Pappademetriou's

involvement due to his age.  Moreover, although Williams' Declaration indicates in quotation

marks that the Seattle managing partner said "don't' send [Pappademetriou] back," Williams

tellingly failed to include "due to his age and style," in quotation marks.  A logical inference is

that Williams excluded any reference to Pappademetriou's age from quotation marks because the

manager did not voice such sentiments, but instead Williams was of the opinion that age was the

basis for the partner's request.

Even if the Seattle partner had referred to Pappademetriou's age, there is no evidence that

the partner was involved in the decision to terminate Williams or that Viehman held the same

beliefs.  Rather, Williams simply claims he faced "general resistance" to Pappademetriou's input

from Viehman and the marketing director in the D.C. office.  This does not seem unusual given

that P+W did not bring Pappademetriou on board, but instead Williams did.  Additionally, this

"general resistance" may have been associated with the costs of paying Pappademetriou who, as

an independent contractor, billed P+W at $125 per hour.  (*See* Pappademetriou Dep. at 18.)

Moreover, Pappademetriou testified that he was not aware of any other independent contractors

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

in the D.C. office.  (Pappademetriou Dep. at p. 31-32.)  Thus, Williams has no evidence that

P+W treated Pappademetriou unfavorably compared to those outside of his protected class.

As to the "hurtful and negative" comments Williams overheard, his allegations are too

conclusory to create evidence of discrimination.  *See Taylor v. F.D.I.C.,* 132 F.3d 753, 763

(D.C. Cir. 1997) (The court will "not accept bare conclusory allegations as fact.")  But even if

Fawell, Moore and Manlove did make ageist comments, there is no evidence that  these three

were involved in the decision to terminate Williams.

Finally, and more importantly, these allegations regarding "hurtful and negative

comments" are found in Williams' declaration which conflicts with his prior deposition

testimony.  (*See* Doc. 18-3, Williams Decl. ¶¶ 2-4.)  When asked during his deposition whether

he recalled hearing "any member of management make any remarks derogatory of age,"

Williams responded

> A.    So Management would be who in your - -
>
> Q.    Principals?
>
> A.    Any principals made any derogatory statements about age?  I don't recall.

(Williams Dep. at 123.)   Williams cannot establish pretext by offering an affidavit that

contradicts his prior deposition testimony.  *See Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030

(D.C. Cir. 2007) ("Virtually every circuit has adopted a form of the so-called 'sham affidavit

rule,' which precludes a party from creating an issue of material fact by contradicting prior

sworn testimony unless the 'shifting party can offer persuasive reasons for believing the

supposed correction' is more accurate than the prior testimony") (citations omitted).

SUMMARY MEMORANDUM OPINION;
NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

## IV.   CONCLUSION

Because P+W has proffered a legitimate non-discriminatory reason for Williams'

termination and because Williams has failed to proffer evidence from which a reasonable jury

could conclude that P+W's reason was a pretext for age discrimination, the Court will grant

P+W's motion for summary judgment.  An order accompanies this Memorandum Opinion.


Date:  March 29, 2013


_____
ROBERT L. WILKINS
United States District Judge